THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| AMERICAN ATHEISTS, INC., a Texas non-profit corporation; R. ANDREWS, S. CLARK and M. RIVERS, | ) ) ) ) | Case No. 2:05CV00994 DS |
| Plaintiffs, | ) | |
| vs. | ) | MEMORANDUM DECISION |
| COLONEL SCOTT T. DUNCAN, Superintendent, Utah Highway Patrol; JOHN NJORD, Executive Director, Utah Department of Transportation; D'ARCY PIGNANELLI, Executive Director, Department of Administrative Services; and F. KEITH STEPAN, Director Division of Facilities Construction and Management Department of Administrative Services, | ) ) ) ) ) ) ) | |
| Defendants | ) | |
| UTAH HIGHWAY PATROL ASSOCIATION, | ) ) | |
| Intervener-Defendant. | ) | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

This matter is before the court to address the following pending motions:  Plaintiffs'

Motion for Partial Summary Judgement Re: Christian Cross as Religious Symbol (#27);

Intervenor-Defendant UHPA's Motion for Summary Judgment and Request for Hearing (#176);

Plaintiffs' Motion for Partial Summary Judgment Re: Standing, Etc (#110);  Plaintiffs' Motion

1

for Summary Judgment (incorporating Plaintiffs' Pending Motion for Partial Summary Judgment as to Message of a Christian Cross, Plaintiffs' Pending Motion re: Affirmative Defenses, Intervener's Pending Motion for Summary Judgment) (#163); State Defendants' Motion for Summary Judgment (Establishment of Religion) (#165). Plaintiffs, the State Defendants, and Intervener-defendant Utah Highway Patrol Association appeared before the court for oral argument on November 13, 2007.

## Statement of Undisputed Material Facts

1. The Utah Highway Patrol Association ("UHPA"), is a private, non-profit Utah corporation that supports the Utah Highway Patrol ("UHP") officers and their families.

2. The UHPA is not a religious organization.

3. The UHPA supports and represents the interests of fallen troopers and their families.

4. The idea for the UHPA Fallen Trooper Memorial program began after twenty-seven year old Trooper William J. Antoniewicz was ambushed and killed near the Utah-Wyoming border.

5. UHPA President Lee Perry helped conceive of the memorial program after he learned that there was nothing to memorialize the spot where Trooper Antoniewicz had fallen.

6. Families of other fallen troopers contacted the UHPA requesting that similar memorials be erected for their lost loved ones as well.

7. The UHPA obtained the consent of at least one family member for each memorial erected.

8. No family member has ever requested any symbol other than the cross as the basis of the memorial. Because the UHPA exists to serve family members of highway patrolmen, the

UHPA would provide another memorial symbol if requested by the family.

9.   Memorials to fallen troopers were originally placed on private property, with the owner's consent, at or near where the trooper died.  After a while, the UHPA obtained permission from the State of Utah, including the Utah Department of Transportation, to erect roadside memorials on state property to honor state troopers who died in the line of duty.

10.   Permission was granted by Utah Department of Transportation to erect the memorials in rest areas, view areas, etc., and UDOT has established a procedure for UHPA to secure permission to erect its memorial crosses.

11.   UHPA sought and received permission from the State of Utah, Division of Facilities. Construction & Management to erect the two (2) existing memorial crosses at the Utah Highway Patrol offices, 5770 South 320 West, Murray, Utah, as well as additional crosses as the need arises.

12.   The UHPA decided to honor thirteen troopers by placing memorials at or near the location where the trooper died or was mortally injured while serving in the line of duty .

13.   The UHPA chose the locations where the memorials are placed because they were (1) visible to the public; (2) safe to stop and view; and (3) as close to the actual spot of the trooper's death as possible.

14.   At each location, the UHPA erected a twelve-foot white metal cross, bearing a plaque with the picture of the trooper and his or her biography.

15.   The memorials also bear the Utah Highway Patrol logo and the trooper's name, rank, and badge number and the year the trooper died in large black font.

16.     The UHPA was authorized to use the UHP logo on the memorials to fallen peace officers because the officers were Utah State Highway Patrol Troopers.

17.     The UHPA did not use any state funds to finance its memorial efforts; rather the UHPA created, designed, funded, erected, and maintains the memorials.

18.     The Utah Department of Transportation ("UDOT") took no part in designing or selecting the memorial cross.

19.     The stated purpose of the UHPA memorial is:  a. To memorialize troopers who died in the line of service; b. Remind the traveling public of the service and sacrifice of the troopers on the highways and elsewhere in Utah; c. Remind the traveling public to drive safely and vigilantly.

20.     A highly motivating factor in the selection of the memorial cross was UHPA's belief that only a cross could effectively convey the simultaneous messages of death, honor, remembrance, gratitude, sacrifice, and safety.

21.     The UHPA also chose the white cross because it is commonly used as a memorial symbol in cemeteries, particularly government owned/sponsored military cemeteries in this country and elsewhere in the world.

22.     The UHPA chose the white cross because such crosses are a time-honored medium for memorializing soldiers, and the fallen troopers it represents are entitled to the same high honor because each of them died in the line of duty for their fellow citizens.

23.     The UHPA chose a memorial symbol which combined a white, 12 foot high steel cross, large black lettering, and the conspicuous beehive logo to conspicuously and immediately convey the death of a Utah Trooper to observers that drive by the memorials.

4

24.     The official Utah Highway Patrol beehive logo placed on the memorial cross is approximately sixteen inches wide and twelve inches high and hangs just below the place where the arms of the cross intersect.

25.     The UHPA did not intend to convey a religious message when it selected the cross as a memorial symbol.

26.     White crosses are used to remind motorists of the dangers of the road.

27.     The corporate plaintiff American Atheists, Inc. is a non-profit Texas corporation.

28.     Individually named plaintiffs are members of American Atheists, Inc. and are adult citizens and residents of the State of Utah.

29.     American Atheists, Inc. is established for the purpose of advocating, laboring for, promoting . . . the Jeffersonian concept of complete and absolute separation of church and state.

30.     The cross has historically been associated with Christianity and used by many Christian churches as a religious symbol.

31.     Crosses are found prominently on the steeples and the spires of buildings, churches, and cathedrals of many Christian faiths in and outside of Utah.  Christian crosses are displayed on the fronts of church buildings, in the worship areas of Catholic and Episcopal churches and on the vestments of clerics and jewelry worn by members of various Christian faiths.

32.     A majority of Utahns, approximately fifty-seven percent, are members of the Church of Jesus Christ of Latter-day Saints.

33.     Neither the Church of Jesus Christ of Latter-day Saints nor its members use the cross as a

symbol of their religion or in their religious practices.

34.   There are  no other displays near the memorial crosses.

35.   The memorial crosses are intended to be seen by motorists using the adjacent roads of the State of Utah.

36.   The individual plaintiffs have experienced direct and unwelcome contact with the memorial crosses.

37.   The individual plaintiffs are unable to avoid encountering the memorial crosses because of their use of State owned and maintained roads, highways, facilities, rest areas, etc. where the memorial crosses are located.

38.   The visual impact of seeing the UHP logo on the memorial crosses offends, intimidates, and affects individual plaintiffs.

39.   The Establishment Clause claims in this lawsuit are based on: (1) the presence of most of the memorial crosses on government property and (2) the presence of the official UHP logo on all the memorial crosses.

**I.  BRIEF BACKGROUND**

The Utah Highway Patrol Association ("UHPA"), a private, non-profit Utah corporation that supports the Utah Highway Patrol ("UHP") officers and their families, obtained permission from the State of Utah to erect roadside memorials to honor state troopers who died in the line of duty.   The UHPA decided to honor thirteen troopers by placing memorials near the location where the trooper died or was mortally injured.  The UHPA placed some of these memorials on private property and placed other memorials on government-owned land adjacent to state highways.

At each location, the UHPA erected a twelve-foot white metal cross, bearing a plaque with the picture of the trooper and his or her biography.  The memorials also bear the Utah Highway Patrol logo and the trooper's name, rank, and badge number. The UHPA did not use any state funds to finance its memorial efforts.  The UHPA created, designed, funded, erected, and maintains the memorials.  Additionally, local businesses contributed labor, materials, and other resources to assist the UHPA.

American Atheists, Inc. ("Plaintiffs") brought suit under 42 U.S.C. §1983 against several Utah state officials ("State Defendants"), alleging that the State Defendants violated the Establishment Clause, the Free Expression Clause, and Article I of the Utah Constitution by permitting the UHPA to erect the memorial crosses.[1]  UHPA sought to intervene to protect its interests as creator and maintainer of the memorials and the court granted the motion to intervene (hereafter, both defendants are collectively referred to as "Defendants" as the text requires). Plaintiffs filed a motion for partial summary judgment, asking this court to declare that "the stand alone Christian crosses that are the subject matter of this action are, as a matter of law, exclusively religious symbols."  Plaintiffs' Motion for Partial Summary Judgment Re: Christian Cross as Religious Symbol at 2 (Docket # 27).  The UHPA then filed a motion for summary judgment as an intervener-defendant and requested the Court dismiss all of Plaintiffs' claims and schedule a hearing.  The parties thereafter took a year to do discovery and these motions were put

---

[1] The Free Expression claim has since been withdrawn by plaintiffs and will not be addressed in this Memorandum Decision.  The court recognizes Plaintiffs' claims that Defendants' actions violate the Establishment Clause of the Utah Constitution, Art. I, § 4 (" . . .No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or for the support of any ecclesiastical establishment.") as well as the Federal Constitution.  Plaintiffs argue the state constitutional provision is stronger and clearer than its federal counterpart. For the sake of simplicity, we will simply refer to the remaining alleged violations as violations of the First Amendment and not as alleged violations of the First Amendment and the Utah Constitution's relevant provisions. Where relevant, the court will reference important differences.

on hold.  At the end of July 2007, new summary judgment motions were filed (as listed above)

and all are now ripe for determination by the court.  While some of the motions are new, the

issues remain the same as those addressed in the parties' first motions for summary

judgment–whether the State Defendants violated the Establishment Clause by allowing UHPA to

erect memorial crosses bearing the UHP logo on state-owned property.

## II.      Standing (Plaintiffs' Motion for Partial Summary Judgment #110)

The court addressed the issue of standing at the beginning of the hearing and ruled that

Plaintiffs have made sufficient allegations to challenge the constitutionality of the State

Defendants' action.  Individuals have standing to make a First Amendment challenge when they

allege sufficient facts to show that they were "frequently brought into direct and unwelcome

contact" with a monument on public land.  O'Connor v. Washburn Univ., 416 F.3d 1216, 1223

(10th Cir. 2005).  In O'Connor, the Tenth Circuit Court of Appeals held that a university faculty

member and a student had standing to challenge the display of a sculpture that was allegedly

hostile to the Roman Catholic religion.  Id.  The court reasoned that the faculty member and

student had standing because they would have to alter their routes across campus in order to

avoid the sculpture.  Thus, their "allegations that they were frequently brought into direct and

unwelcome contact with the statue [were] sufficient to give them standing" to challenge the

constitutionality of the monument.  Id.

Like the faculty member and the student in O'Connor who frequently came in direct and

unwelcome contact with a monument, Plaintiffs have experienced direct and unwelcome contact

with the memorial crosses at issue in this case.  And just as the plaintiffs in O'Connor had to

alter their routes across campus in order to avoid the sculpture, Plaintiffs would have to alter

their commutes in order avoid contact with the memorials because the UHPA displayed the

crosses in prominent locations on the side of highways.  Consequently, like the faculty member

and the student, Plaintiffs' allegations are sufficient to give them standing to challenge the

constitutionality of the memorial crosses.

III.    **Establishment Clause**

A.      **Overview of Establishment Clause Jurisprudence**

Plaintiffs claim that Defendants' actions violated the Establishment Clause.  Accordingly,

this court must select a standard by which to judge whether a violation occurred.  Finding

appropriate standards of judgment in First Amendment case law, however, provides courts with

an intriguing challenge.  The Supreme Court of the United States resists confining itself to a

single Establishment Clause test since such sensitive analysis is inconsistent with "any single test

or criterion."  Lynch v. Donnelly, 465 U.S. 668, 669 (1984).  Fortunately, the Tenth Circuit Court

of Appeals has provided a workable framework for Establishment Clause questions. O'Connor,

416 F.3d at 1223-24; Bauchman v. West High School, 132 F.3d 542, 551-52 (10th Cir. 1997).

The Tenth Circuit Court of Appeals presented its First Amendment framework after careful

analysis of pertinent Supreme Court case law.  The Supreme Court presented its benchmark

Establishment Clause test in Lemon v. Kurtzman.  403 U.S. 602 (1971).  In Lemon, the Court held

that government action does not violate the Establishment Clause so long as it (1) has a secular

purpose; (2) does not have the principal or primary effect of advancing or inhibiting religion; and

(3) does not foster an excessive entanglement of church and state.  Lemon, 403 U.S. at 612–13.

In the 1980s, however, members of the Court attacked the Lemon test.  See, e.g., County of

Allegheny v. ACLU, 492 U.S. 573, 655 (Kennedy, J., concurring in part and dissenting in part);

Aguilar v. Felton, 473 U.S. 402, 419 (1985) (Burger, C.J., dissenting); Wallace v. Jaffree, 472 U.S. 38, 89 (1985) (Burger, C.J., dissenting); Mueller v. Allen, 463 U.S. 388, 394 (1983). The Court eventually refined the Lemon test, and, under the revised version, the government impermissibly endorses religion if its conduct has either (1) the purpose or (2) the effect of conveying a message that "religion or a particular religious belief is favored or preferred." Allegheny, 492 U.S. at 592–93 (quoting Jaffree, 472 U.S. at 70 (O'Connor, J., concurring in judgment)). Later case law indicated that the purpose component evaluates whether the government's "actual" purpose is to endorse or disapprove of religion. Edwards v. Aguillard, 482 U.S. 518, 585 (1987); Jaffree, 472 U.S. at 56. The effect component evaluates whether a "reasonable observer," aware of the history and context of the community in which the conduct occurred, would view the practice as communicating a message of government endorsement or disapproval. Capitol Square v. Pinette, 515 U.S. 753, 777 (1995) (O'Connor, J. concurring).

Though the revised Lemon test is "widely accepted as the controlling analytical framework for evaluating Establishment Clause claims," it has been criticized heavily by many, and not all members of the Court have adopted the test. Bauchman, 132 F.3d at 552. Even those who have implemented the revised test disagree on how to apply it. Id. For example, Justice Scalia stated that the Court should eliminate the purpose component of the test, declaring that discerning the government's subjective intent is an impossible task. Edwards, 482 U.S. at 639. (Scalia, J., dissenting).

The recent Ten Commandments cases, Van Orden v. Perry, 545 U.S. 677 (2005), and McCreary County v. ACLU, 545 U.S. 844 (2005), add little clarification. Van Orden was a plurality decision in which none of the concurring judges used the Lemon test and the dissenting judges used

only portions.  The McCreary decision cited the Lemon test, but only applied the purpose prong, with an emphasis on a "neutrality" analysis.

Noting the wide range of opinions regarding the Endorsement tests even before the Van Orden/McCreary decisions, the Tenth Circuit stated:

> [T]he uncertainty surrounding the [Supreme] Court's position regarding the appropriate scope of the endorsement test and the appropriate Establishment Clause analysis, in general, cautions us to apply both the purpose and effect components of the refined endorsement test, together with the entanglement criterion imposed by Lemon.

Bauchman, 132 F.3d at 552.

With that overview of Establishment Clause jurisprudence in mind, this court will follow the Tenth Circuit's guidance and use the following standard to decide the outcome of this case: Has either (1) the purpose or (2) the effect of the State Defendants' conduct conveyed a message that religion or a particular religious belief is favored or preferred, or (3) does the State Defendants' conduct qualify as excessive entanglement?

### B.   PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (#27)

Courts render summary judgment when a party can "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  Plaintiffs have asked the court to declare that "the stand alone Christian crosses that are the subject matter of this action are, as a matter of law, exclusively religious symbols."  The court finds Plaintiffs are not entitled to judgment as a matter of law because the memorial crosses at issue communicate a secular message, a message that a patrolman died or was mortally wounded at a particular location.

In order to determine whether a monument endorses religion, courts examine the context in which the monument is displayed. See Van Orden v. Perry, 545 U.S. 677, 691 (2005) (Rehnquist, C.J., plurality opinion) (pointing out the differing contexts of schoolrooms on the one hand, and legislative chambers and capitol grounds on the other). In Van Orden, the Supreme Court held that a display of the Ten Commandments at a state capitol did not violate the Establishment Clause. The Court recognized that even classic religious symbols may have various meanings and purposes depending on their context. Id. at 690-91. The Court noted that the Ten Commandments were no exception and stated that "[i]n certain contexts, a display of the tablets of the Ten Commandments can convey not simply a religious message but also a secular moral message (about proper standards of social conduct)." Id. at 701 (Breyer, J., concurring in the judgment).

In contrast with the Supreme Court's approach, Plaintiffs request that this Court simply declare the UHPA's Latin crosses to be "exclusively religious" symbols without taking the context in which the UHPA displayed those crosses into account. Plaintiffs cite a number of cases in which courts declared that publicly-displayed Latin crosses violated the Establishment Clause. Plaintiffs fail to state, however, that the courts in those cases examined the purpose and the context or use of the crosses before determining what the crosses communicated. See, e.g., ACLU v. City of St. Charles, 794 F.2d 265, 271 (7th Cir. 1986) (stating, "The display of the cross, at least in the circumstances revealed by the record of this case, is sectarian."); Gonzales v. N. Township, 4 F.3d 1412, 1423 (7th Cir. 1993) (stating, "The crucifix in Wicker Park does not bear secular trappings sufficient to neutralize its religious message.").

12

This court recognizes that the Latin cross, like the Ten Commandments, may act as a secular as well as a religious symbol.  Next, just as the Supreme Court examined the context in which the Ten Commandments were displayed before determining the message they communicated and just as other courts have examined the purpose and context of monuments to identify their significance, this court examines the purpose and context in which the UHPA displayed its memorial crosses to determine whether they communicate a secular or a religious message.  Upon making that inquiry, the court finds that the memorial crosses at issue communicate a secular message, a message that a UHP trooper died or was mortally wounded at a particular location.  Each cross communicates that message by featuring the UHP logo, the name and badge number of the trooper, and a plaque that provides passers-by with a biography of the fallen trooper.  Thus, this court denies Plaintiffs' motion to declare the crosses at issue function as exclusively religious symbols and finds Plaintiffs are not entitled to judgment as a matter of law.[2]

### C.    Remaining Motions for Summary Judgment Addressing Whether Memorial Crosses Violate the Establishment Clause (#163, #165, #176)

#### 1.    Purpose of the Government's Conduct

The court finds the government's conduct did not have the purpose of conveying a message that "religion or a particular religious belief is favored or preferred." Alleghany, 492

---

[2] Intervenor defendant UHPA also contends that Plaintiffs improperly filed the motion for partial summary judgment because they sought to establish a material fact without having asked for summary judgment on any of their claims.  See Fed. R. Civ. P. 56(a),(c),(d).  This argument is valid, but the court chooses to proceed on the merits and address the question presented in all the pending motions on whether the memorial crosses violate the Establishment Clause.

U.S. at 592–93 (quoting <u>Jaffree</u>, 472 U.S. at 70 (O'Connor, J., concurring in judgment)).[3]  In order to succeed on this claim, Plaintiffs would need to demonstrate that Defendants' actual purpose was to endorse or disapprove of religion or a particular religious belief.  <u>See</u> <u>Bauchman</u>, 132 F.3d at 554.  The Supreme Court noted that a court's inquiry on that question "should be deferential and limited."  <u>Jaffree</u>, 472 U.S. at 74; <u>McCreary</u>, 545 U.S. at 900-02 (Scalia, J., dissenting).  <u>But see</u> <u>McCreary</u>, 545 U.S. at 859-66.  In addition, the inquiry should "resist attributing unconstitutional motives to the government, particularly where we can discern a plausible secular purpose."  <u>Bauchman</u>, 132 F.3d at 554.  <u>See also</u> <u>Mueller v. Allen</u>, 463 U.S. 388, 394 (1983); <u>Utah Gospel Mission v. Salt Lake City Corp.</u>, 425 F.3d 1249, 1259 (10th Cir. 2005).

The government actions in question here are the State Defendants' granting permission for the state's UHP logo to appear on cross-shaped memorials and allowing, in some cases, those cross-shaped memorials to be placed on state land adjacent to roadways and adjacent to the UHP headquarters. Plaintiffs have failed to demonstrate that the State Defendants, by granting UHPA permission to erect memorials bearing the UHP logo on public land, intended to convey a message that religion or a particular religious belief is favored or preferred.  On the contrary, the undisputed material facts allow the court to discern a plausible secular purpose in this case, that of honoring UHP troopers who died during their term of service.  Lee Perry, the quartermaster of the UHPA and one of two individuals involved in the conception of the memorial project, described what the roadside crosses are intended to accomplish:

---

[3]The focus of this prong is the government's purpose, not the purposes of any private group (like UHPA). <u>Summum v. City of Ogden</u>, 297 F.3d 995, 1010 (10th Cir. 2002).  Courts have, however, used private groups' stated purposes to inform their inquiry into the government's purposes.  <u>See, e.g., Van Orden v. Perry</u>, 545 U.S. 677, 701 (2005) (Breyer, J., concurring in judgment).

> I wanted a symbol that would convey the following simultaneously: (1) a trooper died while serving near this spot; (2) that trooper will always be honored and remembered for his sacrifice; (3) the people of Utah are indebted and grateful to that trooper's family for their sacrifice; and (4) that safety is a paramount concern to the people of Utah. Because most people would be passing the memorial at fifty-five miles per hour or greater, the symbol needed to prominently communicate all this instantaneously.

Declaration of Lee Perry in Support of Intervener Defendant UHPA's Motion for Summary Judgment at 2.

Judicially noticed facts also support accepting the secular purposes advanced by Defendants.  See Request for Judicial Notice, (# 247).  Significantly, unlike the rest of the United States, only a quarter--or less–of Utah's population belong to a religion that uses the cross for religious purposes.[4]  It would be unprecedented judicial divination for this court to nevertheless discern that the UHPA directors or the state officials were intending to promote those *minority* religions through the use of the cross design.  Neither does the court discern an intent to promote the majority religion in Utah which, while still a Christian sect, does not use the cross–either as a religious symbol, or in its worship practices. Id., Facts 1-5.  Plaintiffs are therefore unconvincing in their assertion that the use of the cross design was to promote religion in general, or any specific religion when neither those involved in the memorial creation nor a majority of the citizens in the state affected use the symbol in their religious practices.[5]

---

[4]57% of Utah residents belongs to the LDS church, a Christian sect which does not use the cross in its religious iconography. Request for Judicial Notice (# 247).

[5]This religious dynamic distinguishes this case from all preceeding cross cases.  In those cases, the majority were Christians that used the cross and those claiming First Amendment protection from that popular use were the minority.  And, as stated in Friedman v. Board of County Commissioners, "[t]he comfort of the majority is not the main concern of the Bill of Rights."  781 F.2d 777, 782 (10th Cir. 1985) (reh'g en banc).  Here such concerns are utterly irrelevant.  It is a minority that uses the cross religiously, and a group presumably representing a different minority claiming First Amendment protection.

As demonstrated by the motion for partial summary judgment asking the court to declare the Latin cross an exclusive religious symbol, Plaintiffs would have the court find the cross' religious symbolism overpowering.  Specifically, they would have the court hold that the cross can *only* carry religious symbolism, and so any governmental use of it (outside of an educational setting) must therefore be for the purpose of endorsing a particular religion, Christianity.  It is true that the cross is readily identifiable as a symbol used by Christianity.  Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 770-71 (1995) (Thomas, J., concurring) (discussing cross as a religious symbol and as a political symbol).  See also, Request for Judicial Notice,¶ 6. But it is quite a leap from there to declare that any display of the Latin cross reveals a religious purpose underlying its use.  See Capitol Square, 515 U.S. at 770-71 (Thomas, J., concurring). Courts should be reticent to engage in proscribing the metes and bounds of how and to what extent certain symbols may permissibly be used.

One area where the Court has sanctioned governmental regulation of symbols is intellectual property law.  The regulation of trademarks has been justified on economic policy grounds.  The law has recognized trademark owners' economic interest in preserving the strength of their marks as validly competing with the interests in freedom of speech and the freedom of expression.  In that sphere, the law generally gives the trademark owners' interests precedence. But outside that sphere, freedom of expression generally rules.  Outside of IP law, the rule seems to be that stated by the Court in the Texas v. Johnson flag burning case:  "To conclude that the government may permit designated symbols to be used to communicate only a limited set of messages would be to enter territory having no discernable or defensible boundaries."  491 U.S. 397, 417 (1989).  In that case, the Court chastised the government for trying to limit the

16

expressive uses of the flag, and through that attempting to prescribe artificial bounds for the flag's symbolic use.

Acknowledging this Supreme Court counsel, and recognizing the inapplicability of Intellectual Property policy to the arguments presented by Plaintiffs, both free expression and "fair use" demand that the court not limit what messages the cross may send.  Rather, the court is persuaded by Defendants that the symbol at issue in this case is capable of broader use than Plaintiffs have represented, and thus the court recognizes the validity of UHPA's secular reasons for choosing the cross design.[6]

Finally, there is no evidence suggesting the Defendants' reasons for choosing the memorial design are a sham, and with reasonable secular purposes to look to instead, the court can give deference to those secular reasons.  Accordingly, the court finds UHPA's reasons for choosing the cross design are convincingly secular.

The court reaches the same conclusion regarding the purposes for using the UHP logo on the memorials and erecting the memorials on state land.  The court can discern the secular purposes of identifying the trooper as affiliated with UHP and marking the spot where the trooper died or was fatally injured.  Further, the stated purposes of wanting the traveling public to see the

---

[6]Plaintiffs aver that Defendants' willingness to consider allowing a symbol other than a cross upon request from a Jewish trooper's family demonstrates conclusively that the cross is a religious symbol used to identify the deceased as Christian.  Plaintiffs  fail to realize that symbols are capable of *simultaneously* carrying multiple meanings.  The court sees no anomaly in a Jewish person that understands that the government's purpose here is not to endorse religion, but is still sensitive enough to desire a memorial other than a cross.  As noted, families of memorialized LDS troopers, who likewise do not use the cross as a religious symbol, have already recognized the government's secular purpose (though the court recognizes that a member of the LDS faith may not necessarily share the same sensitivity to the symbol as a Jewish family).  Further than this, the court declines to comment on this particular hypothetical.  It is undisputed that no one has asked for a different symbol to be used.  Whether the UHPA deigns to grant such a request should the circumstance arise is of no moment here.  The facts compel finding that the purposes of the memorial do not include identifying the religion of the deceased; if the UHPA at some future date makes a decision in consideration of a Jewish family's sensitivities, the secular purposes of the memorial as defined today are not compromised.

memorials and be reminded of safety concerns and the sacrifices made on their behalf are convincing and uncontroverted and have been adopted by the State Defendants.  None of these purposes, nor any other in evidence, belie an intent to "endorse or disapprove" of any sect, or even religion in general.  There is no evidence that any of Defendants' purposes were merely a sham or that they actually harbored other unconstitutional motives to promote religion.  The secular reasons for design and placement of the memorials in evidence before the court are therefore sufficient to pass the secular purpose prong of the Lemon Test.

### 2.    Effect of the Government's Conduct

The second prong of Establishment Clause analysis requires the court to determine whether the State Defendants' conduct has the effect of conveying a message that "religion or a particular religious belief is favored or preferred."Alleghany, 492 U.S. at 592–93 (quoting Jaffree, 472 U.S. at 70 (O'Connor, concurring in judgment)).  In order to succeed on this claim, Plaintiffs need to show that a "reasonable observer," aware of the history and context of the community in which the conduct occurs, would view the practice as communicating a message of government endorsement or disapproval.  Capitol Square, 515 U.S. at 777 (O'Connor, J., concurring).  It is important to note that "on occasion some advancement of religion will result from governmental action," however, actions that confer incidental benefits upon religion can remain constitutionally valid.  Lynch, 465 U.S. at 683.  Furthermore, because this is an objective inquiry, the court need not ask whether a particular individual or group might be offended by the government's actions.  See Bauchman, 132 F.3d at 555.  Like in obscenity law, the question is not posed to the most sensitive in society.  See Miller v. California, 413 U.S. 15, 33 (1973).  Rather, the question is an objective one and the touchstone is whether the government would be

seen as acting neutrally, both as between religions, and also as between religion and non-religion generally.

The court finds that Defendants' conduct does not have the effect of conveying the message that religion in general or any particular religion is favored because the cross here serves as a secular symbol of death or burial, not as a religious symbol. When symbols, such as crosses, take on secular as well as religious connotations in a particular setting, they do not automatically constitute an endorsement of religion.  For example, in Van Orden, the plurality held that a display of the Ten Commandments at a state capitol did not constitute a governmental endorsement of religion. 545 U.S. at 691.  The Court acknowledged that the Ten Commandments possess a religious origin and retain religious significance today.  Id. at 690 (Rehnquist, C.J., plurality opinion).  The plurality, however, emphasized that the Ten Commandments also have an undeniable historical context.  Id. at 689-91.  Americans have a long tradition of displaying the Ten Commandments as a foundation for secular laws as well as religious commandments.  Id. Thus, because the Ten Commandments "ha[ve] dual significance, partaking of both religion and government," their display did not automatically violate the Establishment Clause.  Id. at 692.

Like the Ten Commandments, the cross possesses a religious origin and retains a religious significance today.  And further, like the Ten Commandments, the cross has dual significance, as demonstrated by America's long tradition of displaying the cross as a symbol of death and burial.  For example, American military cemeteries display crosses to represent the death of public servants.  See Exhibit 1, Photographs A-X, UHPA Memorandum in Support of Motion for Summary Judgment (#177-3, 177-4). Cemeteries throughout the United States, including cemeteries in Utah, display row upon row of crosses to mark the burial spot of those

19

who served their community and their country.  <u>See</u> Exhibit 2, Photographs A-J, UHPA

Memorandum in Support of Motion for Summary Judgment (#177-5).  Even our community's

popular culture has adopted the cross to communicate a secular message of death as

demonstrated by the Utah Department of Alcoholic Beverage Control's use of  the cross in its

anti-drinking and driving billboard campaign.  <u>See</u> Exhibit 4, Part 4,  UHPA Memorandum in

Support of Motion for Summary Judgment (#177-10), Deposition Transcript of Michael Rivers,

Exhibit 10.

      A community may come to recognize over time that a traditionally religious symbol does

not necessarily endorse religion.  For example, in <u>Allegheny</u>, the Supreme Court noted that

"[a]lthough Christmas trees once carried religious connotations, today they typify the secular

celebration of Christmas." <u>Allegheny</u>, 492 U.S. at 616.  This progression occurred as Americans

who did not subscribe to Christian beliefs increasingly placed Christmas trees in their homes.

<u>See</u> <u>id.</u> at 616–17.

      Just as the Christmas tree evolved into a secular symbol of celebration, the cross has

evolved into a symbol capable of communicating a secular message of death and burial.  While

the cross retains its religious meaning when placed in religious contexts, it has transformed into a

representation of death and burial when placed in pop culture settings and when used as a

memorial.  Like the Christmas tree, which took on secular symbolism as Americans used the tree

without subscribing to a particular religious belief, the cross has attained a secular status as

Americans have used it to honor the place where fallen soldiers and citizens lay buried, or had

fatal accidents, regardless of their religious belief. And the progression of the cross from a

religious to a secular symbol continues as crosses are increasingly used to symbolize death in

20

advertising campaigns, films, television, and seasonal holiday decorations–frequently having nothing to do with religion or a particular religious belief. Consequently, the court finds a reasonable observer, aware of the history and context of the community would not view the memorial crosses as a government endorsement of religion.

Furthermore, this reasonable observer would be aware of the following regarding the "history and context of the community:" The Church of Jesus Christ of Latter-day Saints, Utah's largest religious demographic, does not, unlike most of the rest of Christianity, use the cross as a religious symbol. The demographic of those who do use the cross as a religious symbol are, on the other hand, a minority of the population.[7] With this understanding, it is unpersuasive to suggest that a reasonable person would conclude that the government's allowing the use of the cross here is to promote the  minority churches which do use the cross; and more, it is illogical to suggest it is to promote the majority church which does not use the cross.

Plaintiffs' suggestion that the State Defendants' allowing the crosses to be placed on state land and to bear the UHP logo may be viewed as a promotion of Christianity in general over non-religion is a more rational theory, but is, nevertheless, one that must likewise fail. Again, Utah's unique demographics severely undercut this argument.  A reasonable observer aware of the history, culture, circumstances, and context of the use of the memorial cross in this case would still fail to attribute a religious motive to the State Defendants' actions.  Having made this finding, the court will distinguish Friedman v. Board of County Commissioners. 781 F.2d 777, 782 (1985) (reh'g en banc) (implying that the average observer would think that the cross on a

---

[7]If Utah is partitioned into three demographic groups, (1) Christians who do not use the cross (mostly LDS), (2) Christians who do use the cross, and (3) religious non-Christians, atheists, and others who would not use the cross, then the size of groups (2) and (3) are roughly equal at around 20% of the population.  Judicially Noticed Facts, Doc. #247.  In nearly every Establishment Clause case, the concern has been the establishment of a religion or religious belief that was held by the majority.  In that sense, this case is unique.

county seal "recalls a less tolerant time and foreshadows its return").  An informed observer in this case would be more reasonable, neutral, and tolerant than the Friedman observer.  In addition, the strictness of the *effects* prong analysis in Friedman is likely not applicable today because that case was decided prior to recent refinements in Establishment Clause jurisprudence, and the court there used the "average" person instead of the "reasonable observer" familiar with the culture and history.  Compare id. ("average observer"), with McCreary, 545 U.S. at 866 ("reasonable observer"), and Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 34-35 (2004) ("reasonable observer").  Even if Friedman's "average" person analysis were applied to the facts of this case, the court would seriously question whether an "average" person would see these crosses and fear the return of a less tolerant time.  In any event, the court is confident that a "reasonable" person would not.  See Friedman, 781 F.2d at 782 (reh'g en banc).  Should someone familiar with the history and demographics of Utah come across one of the cross memorials on the highway or the UHP parking lot, it is extremely unlikely, notwithstanding the reaction of Plaintiffs, that they would infer that the government's use of the cross was to endorse Christianity given the cross's non-use by the largest Christian demographic in the state. Plaintiffs' comment that the passing motorist will think that Christian troopers who use the cross are being propped up as "Christian heroes" while "[n]on-Christians are not part of the respect afforded [deceased Christian troopers]" is unconvincing at best and clearly without reasonable foundation.  Plaintiff's Response in Opposition to UHPA's Second Motion for Summary Judgment, Doc. # 224 at 16.  While we can expect the reasonable observer to be familiar with Utah history and its episodes of religious tension, Bauchman, 132 F.3d at 555, nothing in that history suggests religious intolerance on that level.

22

As discussed above, consideration of context is critical to the court's determination of the Establishment Clause question before it. The memorial crosses' position at the side of the road is devoid of context suggestive of, or conducive to, worship.  True, there is no panoply of other more secular symbols, <u>Allegheny</u>, 492 U.S. at 596 (1989) (discussing <u>Lynch v. Donnelly</u>, 465 U.S. 668 (1984)), or a diversity of other religious symbols to mitigate the cross' potential religious impact.  On the other hand, like the Ten Commandments display in <u>Van Orden v. Perry</u>, there is likewise nothing in the display's context that would *suggest* religious symbolism.  545 U.S. at 702 (Breyer, J., concurring in the judgment).  The simplicity of a white cross with a trooper's name and badge number boldly positioned on the cross arm, the UHP logo prominently positioned in the center, and a plaque with biographical information and a picture standing at the side of a highway with naught but Utah wilderness in either direction is a powerful juxtaposition and underscores the message of driver vigilance and safety, aiming for prevention of further unnecessary deaths in these remote locations.

The effect of the location of the two crosses adjacent to the UHP headquarters is similar. A reasonable observer seeing crosses with a UHP logo prominently displayed in the center standing by the road amidst urban sprawl would more likely receive the message of a trooper's death than government endorsement of religion.  The court recognizes there may be issues presented by the crosses standing so close to an office of government, <u>see</u> <u>Capitol Square</u>, 515 U.S. at 801-02 (Stevens, J., dissenting), but it need not analyze these crosses outside the UHP headquarters as standing alone, <u>see</u> <u>Van Orden</u>, 545 U.S. at 702 (Breyer, J. concurring). The court in <u>Van Orden</u> was aware of the larger scheme into which the Ten Commandments monument fit.  <u>Id.</u>  We can deem the Court's reasonable observer to have been aware of that

larger context as well.  In Van Orden, the Ten Commandments along with sixteen other monuments and 21 historical markers dotted the Texas capitol grounds and were meant to inform visitors of the "people, ideals, and events that compose Texan identity."  Van Orden, 545 U.S. at 681 (Rehnquist, C.J., plurality opinion) (internal quotation and citation removed). So too can this court deem its reasonable observer to be aware of the existence of other UHPA cross memorials around the state and roadside cross memorials in general.  Seen in that perspective, the memorial crosses' proximity to the government office becomes much less remarkable.  They are just part of a larger government-endorsed secular memorial program.

Plaintiffs object not just to the location of the crosses, but also to the presence of the UHP logo.  They assert that the superposition of the government's symbol on the crosses impermissibly sends the message that the government is endorsing Christianity.  While there may be some, like Plaintiffs, who interpret the symbols that way, the court finds that given the context, this is not the response of a reasonable observer.  Just as the locations of the memorials identify the place of a trooper's passing, the primary effect of including the UHP logo on the memorials is identification, not endorsement.  The logo identifies the deceased as UHP troopers. And, as the cross is an effective and efficient symbol for communicating the message of a trooper's death to motorists speeding by, so too, the familiar UHP beehive logo is the most effective and efficient symbol for communicating the deceased's affiliation with the UHP.[8]

Consequently, the court finds that given the context in which the memorial crosses are presented, the reasonable observer familiar with these circumstances, the community's culture,

---

[8]The issue of the use of the UHP logo on the cross memorials is the subject of the State Defendants' Motion for Summary Judgment Docket # 168.  The court's finding here grants the relief requested by the State and disposes of that motion.

and the state's history will not see in this display, which combines the cross and the UHP logo,

government attempting to endorse Christianity nor religion over non-religion.

### 3.    Excessive Entanglement

_____The government's conduct did not foster excessive entanglement of church and state.

Courts typically reserve the entanglement analysis for circumstances in which the state involves

itself with a recognized religious activity or institution.  See, e.g., Lemon, 403 U.S. at 606

(holding that two state statutory programs that aided teachers at non-public schools, including

church-affiliated schools, would foster excessive involvement and entanglement of church and

state).  For example, in Florey v. Sioux Fall School District, the Eighth Circuit Court of Appeals

held that a school board's adoption of rules permitting the observance of holidays with a

religious and secular basis did not constitute excessive entanglement of church and state.  619

F.2d 1311, 1318 (1980).  The court noted that the Supreme Court's past entanglement cases

reviewed governmental aid to sectarian institutions to avoid the danger of state repression of such

institutions.  Because this danger was absent and because no analogous entanglement existed, the

court held that the school board's adopted rules did not constitute excessive entanglement of

church and state.  Id.

The Tenth Circuit followed a similar entanglement approach when it held that a school's

choice to sing religious songs in various religious venues did not qualify as excessive

entanglement.  Bauchman, 132 F.3d at 556.  The court noted that "[t]he entanglement analysis

typically is applied to circumstances in which the state is involving itself with a recognized

religious activity or institution."  Id.  Since that did not occur and since the court could not

perceive any additional state involvement with recognized religious activity, the court held that the school's conduct did not constitute excessive entanglement of church and state.  Id.

Unlike the typical Supreme Court cases in which the state provided governmental aid to sectarian institutions, Defendants, in the case at hand, did not provide aid to a sectarian institution.  In contrast, the government merely permitted UHPA, a non-religious institution, to erect memorials for fallen officers.  The state did not provide financial aid, otherwise involve itself with a recognized religion, or take any action that could reasonably be viewed as repressing a religious institution, neither directly, nor indirectly, by promoting a different religious institution.  Ultimately, there is no religious institution in this case with which the state might be entangled.  There is only the UHPA, a non-religious institution.  Accordingly, this Court follows the lead of the Eighth and Tenth Circuits and holds that Defendants' action did not constitute an excessive entanglement of church and state.[9]

Accordingly the court finds no Establishment Clause violation of either the First Amendment of the United States Constitution nor Article I of the Utah Constitution.  While Plaintiffs may be accurate that the state constitutional provision regarding the establishment of religion is stronger and clearer than its federal counterpart, there are no facts in evidence from which this court could find a violation of the state provisions referenced by Plaintiffs.  The undisputed facts and evidence before this court demonstrate that no public money or property was appropriated for or applied to any religious worship, exercise or instruction as a result of the UHPA memorial cross program.  Furthermore, as stated above, the UHPA is not a religious

---

[9]At the November 13, 2007 hearing, Plaintiffs conceded that their entanglement arguments were weak.

organization so any incidental support offered to this program by the State Defendants cannot be

construed to be "support of any ecclesiastical establishment."  Utah Const. art. I, § 4.

By way of final comment, the court offers the following:

[T]he Establishment clause does not compel a government to purge from the
public's sphere all that in any way partakes of the religious.   Such absolutism is
not only inconsistent with our national traditions, but would also tend to promote
the kind of social conflict the Establishment Clause seeks to avoid.

Van Orden, 545 at 699 (Breyer, J., concurring in judgment) (citations omitted).  Both the United

States Constitution as well as the Utah State Constitution assure that government should show no

preference toward religion in general nor any religion in particular.  That said, it is not the place

of law or government, using Establishment Clause jurisprudence, to exhibit hostility toward

religion.  Such "has no place in our Establishment Clause tradition."  Id.. at 704.

**IV.    Conclusion**

Accordingly, the court grants Plaintiffs' motion for partial summary judgment on standing (# 110), denies Plaintiffs' motion for partial summary judgment (#27), and grants Defendants' motions for summary judgment (#163, # 165, #170, #176).[10]

SO ORDERED.

Dated this 20th day of November, 2007.

BY THE COURT:

_____        DAVID SAM
                                        SENIOR JUDGE
                                        U.S. DISTRICT COURT

---

[10]In oral argument, the UHPA raised the issue of non-public forum and addressed its effect on the Establishment Clause questions before the court.  The State Defendants did the same in briefing submitted in support of a motion for summary judgment not specifically argued at the November 13, 2007 hearing.  Having determined that the memorial crosses are not exclusively religious symbols and that no Establishment Clause violation has occurred as a result of the State Defendants' limited participation in this UHPA program, the court need not address the issue and effect of Defendants' nonpublic forum arguments.  Accordingly, State Defendants' motion for summary judgment (nonpublic forum) (Docket # 170) is rendered moot.